1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARTIN TRILLO,

11               Plaintiff,                 No. CIV S-06-0075 RRB DAD P

12        vs.

13   N. GRANNIS, et al.,

14               Defendants.                <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16               Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking

17   relief under 42 U.S.C. § 1983.  The matter is before the court on defendants' motion for summary

18   judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff has filed

19   a timely opposition to the motion.  Defendants have filed a reply.

20                                **BACKGROUND**

21               On January 12, 2006, plaintiff commenced this action by filing a complaint

22   against defendants Grannis, Howard, Wedell, Hooper, Van Cor, Friend, and Sogge, alleging that

23   they were deliberately indifferent to his serious medical needs.  Specifically, plaintiff alleges that

24   he suffers from hypertension, hepatitis C and liver damage, carpal tunnel syndrome and pain

25   associated with damage to his spinal column.  Plaintiff claims that he has received inadequate

26   medical care in violation of his constitutional rights.

1

1    At screening the court determined that plaintiff's complaint appeared to state

2    cognizable claims for relief against defendants Grannis, Howard, Wedell, Hooper, Van Cor,

3    Friend, and Sogge, and in due course, the United States Marshal served plaintiff's complaint on

4    those defendants.  On April 17, 2006, defendants filed their answer.  On April 24, 2006, this

5    court issued a discovery order.  On April 27, 2007, defendants filed the pending motion for

6    summary judgment, arguing that the evidence presented in support of the motion establishes that

7    they were not deliberately indifferent to plaintiff's medical needs.  Plaintiff opposes the motion

8    essentially on the grounds that the evidence he has submitted in opposition to the motion for

9    summary judgment establishes that defendants' medical care fell below constitutional standards.

10   Defendants have filed a reply, emphasizing that there are no genuine issues of material fact in

11   this case and they are entitled to summary judgment in their favor.

12                **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

13   Summary judgment is appropriate when it is demonstrated that there exists "no

14   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

15   matter of law."  Fed. R. Civ. P. 56(c).

16          Under summary judgment practice, the moving party
17          always bears the initial responsibility of informing the district court
             of the basis for its motion, and identifying those portions of "the
             pleadings, depositions, answers to interrogatories, and admissions
18           on file, together with the affidavits, if any," which it believes
             demonstrate the absence of a genuine issue of material fact.

19

20   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

21   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

22   judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

23   to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

24   after adequate time for discovery and upon motion, against a party who fails to make a showing

25   sufficient to establish the existence of an element essential to that party's case, and on which that

26   party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

2

1  concerning an essential element of the nonmoving party's case necessarily renders all other facts

2  immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as

3  whatever is before the district court demonstrates that the standard for entry of summary

4  judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

5           If the moving party meets its initial responsibility, the burden then shifts to the

6  opposing party to establish that a genuine issue as to any material fact actually does exist. See

7  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

8  establish the existence of this factual dispute, the opposing party may not rely upon the

9  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

10 form of affidavits, and/or admissible discovery material, in support of its contention that the

11 dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

12 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

13 of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

14 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

15 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

16 return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

17 1436 (9th Cir. 1987).

18          In the endeavor to establish the existence of a factual dispute, the opposing party

19 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

20 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

21 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

22 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

23 genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

24 committee's note on 1963 amendments).

25          In resolving the summary judgment motion, the court examines the pleadings,

26 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

1   any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,

2   477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the

3   court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.

4   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

5   produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen

6   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

7   1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

8   show that there is some metaphysical doubt as to the material facts . . . . Where the record taken

9   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

10   'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

11        On February 10, 2006, the court advised plaintiff of the requirements for opposing

12   a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154

13   F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

14                        **OTHER APPLICABLE LEGAL STANDARDS**

15   I. Civil Rights Act Pursuant to 28 U.S.C. § 1983

16        The Civil Rights Act under which this action was filed provides as follows:

17        Every person who, under color of [state law] . . . subjects, or causes
          to be subjected, any citizen of the United States . . . to the
18        deprivation of any rights, privileges, or immunities secured by the
          Constitution . . . shall be liable to the party injured in an action at
19        law, suit in equity, or other proper proceeding for redress.

20   42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the

21   actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See

22   Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

23   (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the

24   meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or

25   omits to perform an act which he is legally required to do that causes the deprivation of which

26   complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

                                          4

1    Moreover, supervisory personnel are generally not liable under § 1983 for the

2  actions of their employees under a theory of <u>respondeat</u> <u>superior</u> and, therefore, when a named

3  defendant holds a supervisorial position, the causal link between him and the claimed

4  constitutional violation must be specifically alleged.  See <u>Fayle v. Stapley</u>, 607 F.2d 858, 862

5  (9th Cir. 1979); <u>Mosher v. Saalfeld</u>, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory

6  allegations concerning the involvement of official personnel in civil rights violations are not

7  sufficient.  See <u>Ivey v. Board of Regents</u>, 673 F.2d 266, 268 (9th Cir. 1982).

8  II.  <u>Eighth Amendment and Adequate Medical Care</u>

9    The unnecessary and wanton infliction of pain constitutes cruel and unusual

10  punishment prohibited by the Eighth Amendment.  <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986);

11  <u>Ingraham v. Wright</u>, 430 U.S. 651, 670 (1977); <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-06 (1976).

12  In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove

13  that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials

14  acted with deliberate indifference in allowing or causing the deprivation to occur.  <u>Wilson v.</u>

15  <u>Seiter</u>, 501 U.S. 294, 298-99 (1991).

16    Where a prisoner's Eighth Amendment claims arise in the context of medical

17  care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence

18  deliberate indifference to serious medical needs."  <u>Estelle</u>, 429 U.S. at 106.  An Eighth

19  Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need

20  and the nature of the defendant's response to that need."  <u>McGuckin v. Smith</u>, 974 F.2d 1050,

21  1059 (9th Cir. 1991), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133

22  (9th Cir. 1997) (en banc).

23    A medical need is serious "if the failure to treat the prisoner's condition could

24  result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

25  <u>McGuckin</u>, 974 F.2d at 1059 (quoting <u>Estelle v. Gamble</u>, 429 U.S. at 104).  Indications of a

26  serious medical need include "the presence of a medical condition that significantly affects an

1   individual's daily activities." Id. at 1059-60.  By establishing the existence of a serious medical

2   need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.

3   Farmer v. Brennan, 511 U.S. 825, 834 (1994).

4          If a prisoner establishes the existence of a serious medical need, he must then

5   show that prison officials responded to the serious medical need with deliberate indifference.

6   Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials

7   deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in

8   which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94

9   (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard

10  to medical care, however, "the indifference to his medical needs must be substantial.  Mere

11  'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

12  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

13  105-06).  Deliberate indifference is "a state of mind more blameworthy than negligence" and

14  "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'"  Farmer,

15  511 U.S. at 835 (quoting Whitley, 475 U.S. at 319).

16          Delays in providing medical care may manifest deliberate indifference.  Estelle,

17  429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

18  providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d

19  1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332,

20  1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v.

21  Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  "A prisoner need not

22  show his harm was substantial; however, such would provide additional support for the inmate's

23  claim that the defendant was deliberately indifferent to his needs."  Jett v. Penner, 439 F.3d 1091,

24  1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

25          Finally, mere differences of opinion between a prisoner and prison medical staff

26  as to proper medical care do not give rise to a § 1983 claim.  Jackson v. McIntosh, 90 F.3d 330,

332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I. Defendants' Statement of Undisputed Facts and Evidence

        Defendants' lengthy statement of undisputed facts is supported by citations to a declaration by defendant J. Wedell, who is a physician and surgeon at CSP-Sacramento; a declaration by defendant J.H. Friend, who is a consulting physician in the private practice of physical medicine and rehabilitation eletrodiagnosis; a declaration by defendant J. Howard, who is a Health Care Manager and Chief Medical Officer at CSP-Sacramento; a declaration by defendant M. Sogge, who is a consulting physician in the private practice of medicine, specializing in gastroenterology; and copies of plaintiff's medical records.

        Defendants' evidence establishes that as early as October 11, 2002, plaintiff's medical chart detailed a history of renal cell cancer, hypertension, cervical spine disc disease, pain in both hands, and hepatitis C – all of which are serious medical conditions. Defendants' evidence also establishes the following facts

        A. Plaintiff's Hypertension Treatment

        As early as April 16, 2002, Dr. Penner prescribed plaintiff Enalapril to treat his high blood pressure. On May 22, 2002, plaintiff was evaluated for cardiovascular chronic care and was diagnosed with hypertension. Plaintiff received frequent blood pressure checks and was prescribed a variety of high blood pressure medications, including Amlodipine, Amlodipine Besylate, Enalapril, Clonidine, Hydrochlorothiazide, and Lisinopril.

        Over the course of his treatment, plaintiff suffered three hypertensive episodes. On March 8, 2003, plaintiff experienced chest pains and high blood pressure. Dr. Dazo prescribed Norvasc (an amlodipine besylate) in addition to the medication plaintiff was already taking. On August 13, 2003, plaintiff experienced headaches and dizziness. At the time, plaintiff reported that his blood pressure had been under control in the 130/80 range but had

spiked to 160/100.  Accordingly, plaintiff's medication was changed to Clonidine.  By September 7, 2003, plaintiff's blood pressure had stabilized in the pre-hypertensive range, and remained in that range until February 2005.  On February 1, 2005, plaintiff experienced another spike in his blood pressure that continued until February 9, 2005, when his hypertension medications were changed to include the Clonidine skin patch, Hydrochlorothiazide and Lisinopril.  The medication adjustment in February 2005 resulted in successful management of plaintiff's hypertension and reduced his blood pressure levels to normal pre-hypertensive ranges.

B.  Plaintiff's Degenerative Spine Disease Treatment

On October 10, 2002, plaintiff reported a tingling and numbness in his arms and pain in his legs.  On October 11, 2002, plaintiff was prescribed Gabapentin, a widely-used pain medication and referral for consultation with a specialist was considered.  In November 2002, plaintiff was prescribed Tylenol 3, a stronger pain reliever containing acetaminophen and codeine, and Gabapentin was discontinued.  In January 2003, plaintiff was prescribed Gabapentin again, in addition to his acetaminophen and codeine.  Plaintiff's primary care physician and chronic care physicians regularly evaluated him relative to his pain and continued to prescribe medications.

On March 6, 2003, plaintiff saw Dr. Michael Hevor, a neurologist, at the Doctors Hospital of Manteca for evaluation.  Plaintiff complained of a stiffness in the cervical region but did not describe any recent trauma.  This was the first medical indication of a problem with plaintiff's spine.  Dr. Hevor sought to rule out cervical radiculopathy and metastatic disease and recommended an MRI of plaintiff's cervical spine.  On March 28, 2003, plaintiff underwent an MRI which revealed no evidence of acute bony injury of the cervical spine C1 through C6.  However, C7 and T1 were not clearly visible.  As plaintiff's symptoms worsened, Dr. Wedell requested another MRI of plaintiff's cervical spine and upper extremities.  On October 10, 2003, plaintiff underwent an MRI at Doctors Hospital in Manteca which revealed that plaintiff's cervical vertebrae were normal; bone marrow signals were normal; and vertebral heights were

1   maintained.  Both C5-6 and C6-7 showed minimal broad-based annular bulge, but there was no

2   evidence of significant cord compression, myeloathy or central spinal stenosis.

3           Based on the results of this MRI, on December 11, 2003, Dr. Wedell requested

4   physical therapy and a neurological consultation with Dr. Farr, an orthopedic specialist.  On

5   January 15, 2004, plaintiff underwent another MRI, this time of his lumbar spine.  The MRI

6   revealed that plaintiff had mild degenerative disc disease at L1-2 and L2-3.  On May 17, 2004,

7   plaintiff saw Dr. Farr at Doctors Hospital in Manteca who recommend neither another

8   electromyographic (EMG) examination or surgery but did recommend a whole body bone scan to

9   rule out metastasis as a source of plaintiff's pain.  On May 28, 2004, plaintiff underwent another

10  examination of his cervical spine.  The examination revealed plaintiff had degenerative disc

11  disease at C5-6 and C6-7, more prominent at C6-7.

12          On August 13, 2004, plaintiff underwent a whole body bone scan.  The results

13  were normal.  On August 30, 2005, plaintiff underwent a CT scan of his chest which showed his

14  chest was clear of any acute disease.  Beginning on May 22, 2002, plaintiff's primary care

15  physician and chronic care physicians regularly evaluated him, initially because of hypertension,

16  and, over time, for his renal cell cancer recovery, cervical disc disease, asthma, pain, carpal

17  tunnel syndrome and hepatitis C conditions.

18          Plaintiff has a chronic degenerative disease of the cervical and lumbar spine.

19  Degenerative spine disease is a major cause of chronic disability and a common reason for

20  referral to an MR imaging center.  Spinal degeneration to some degree is a normal part of aging.

21  Pain can originate from a person's bones, joints, ligaments, muscles, nerves, and intervertebral

22  disks, as well as other para-vertebral tissues.

23          Plaintiff's cervical and lumbar spine care included speciality consultation, x-ray

24  examination, MRI examination, EMG examination, a whole body bone scan, physical therapy,

25  and regular evaluations by his primary care and chronic care physicians.  Plaintiff's pain

26  /////

1    management involved a wide variety of prescription pain medications, ranging in strength.

2    Plaintiff did not undergo surgery because Dr. Farr did not recommend it.

3                 C.   Plaintiff's Carpal Tunnel Syndrome Treatment

4           As noted above, in October 2002, plaintiff reported tingling and numbness in his

5    arms. Initially, plaintiff's primary care physicians doubted the presence of carpal tunnel

6    syndrome, but nonetheless ordered bilateral carpal tunnel splints and wrist braces for him. On

7    March 6, 2003, when Dr. Hevor examined plaintiff, he recommended nerve conduction studies

8    of his upper extremities to rule out bilateral carpal tunnel syndrome.

9           On March 18, 2003, Dr. Wedell requested a consultation and routine EMG by Dr.

10   Friend. On November 7, 2003, Dr. Hooper reordered the consultation "ASAP." On July 26,

11   2004, Dr. Wedell put in an "urgent" request for the consultation. On September 10, 2004,

12   plaintiff saw Dr. Friend for an electromyographic examination.

13          Dr. Friend noted that plaintiff had intermittent pain and numbness in both hands

14   during the prior year and a half and ruled out cervical nerve root irritation. Plaintiff underwent

15   sensory and motor nerve conduction studies revealing that plaintiff's right and left median nerves

16   were abnormal as the distal motor and sensory latencies were delayed across the wrist segments.

17   This is consistent with compression of both the right and left median nerves at the wrists. The

18   studies also revealed the median and ulnar nerve distribution of the right and left forearm and

19   hand were normal and showed no evidence of motor nerve injury. Dr. Friend's report was the

20   extent of his involvement in plaintiff's carpal tunnel syndrome treatment.

21          On November 24, 2004, plaintiff saw Dr. Williams at Doctors Hospital of

22   Manteca for a consultation regarding his carpal tunnel condition. Dr. Williams' plan of treatment

23   was to perform carpal tunnel release surgery on plaintiff's right hand and then on his left hand.

24   On February 5, 2005, Dr. Duc requested approval for plaintiff's right hand surgery, and on April

25   8, 2005, Dr. Williams performed the surgery. Upon plaintiff's return to the institution, he saw

26   /////

1 Dr. Hooper who issued a series of post-operative orders for plaintiff's care, including pain

2 medication.

3         On May 13, 2005, plaintiff underwent x-rays of his hands after reportedly

4 suffering from pain in both of them.  The x-rays revealed that his right hand had some soft tissue

5 swelling but no bony abnormality, and his left hand had no significant abnormalities.  On May

6 18, 2005, Dr. Williams examined plaintiff for carpal tunnel syndrome in his left hand.  On May

7 24, 2005, Dr. Duc requested approval for plaintiff's left hand surgery, and on June 18, 2005,

8 plaintiff was approved for surgery.

9         D.  Plaintiff's Pain Management Treatment

10         From April 2002 to March 2006, plaintiff's pain management included use of a

11 wide variety of prescription pain medications, ranging from pain relievers used to relieve mild to

12 moderate pain to prescription medications used to relieve severe pain.  Plaintiff was also

13 prescribed non-sterodial anti-inflammatory drugs, corticosteroids to decrease inflammation and

14 muscle relaxants.  Plaintiff's primary care physician and chronic care physicians regularly

15 evaluated his pain and prescribed medications.

16         Defendant Howard, the CSP-Sacramento Health Care Manager from May 28,

17 2004, to January 17, 2005, was not personally involved in plaintiff's medical care.  His only

18 involvement with plaintiff was in responding to his inmate appeals in which Dr. Howard

19 acknowledged plaintiff's concerns about his pain medications, but referred him to California

20 Code of Regulations 3354(a), which states that inmates may not diagnose illness or prescribe

21 medication.

22         E.  Plaintiff's Hepatitis C Treatment

23         Hepatitis C is a blood-borne, infectious, viral disease that is caused by a

24 hepatotropic virus.  The infection can cause liver inflammation that is often asymptomatic.

25 However, ensuing chronic hepatitis can result in cirrhosis of the liver and liver cancer.  The

26 symptoms of hepatitis C can be medically managed, and a proportion of patients can be cleared

1  of the virus by a long course of anti-viral medicines.  Chronic hepatitis C is defined as an

2  infection with hepatitis C virus persisting more than six months.  Symptoms specifically

3  suggestive of liver disease are typically absent until substantial scarring of the liver has occurred.

4  However, hepatitis C is a systemic disease, and patients experience a wide spectrum of clinical

5  manifestations ranging from an absence of symptoms to debilitating illness prior to the

6  development of advanced liver disease.

7          Generalized signs and symptoms associated with chronic hepatitis C include

8  fatigue, marked weight loss, flu-like symptoms, muscle pain, joint pain, intermittent low-grade

9  fevers, itching, sleep disturbances, abdominal pain, appetite changes, nausea, diarrhea, dyspepsia,

10  cognitive changes, depression, headaches and mood swings.  A hepatitis diagnosis is rarely made

11  during the acute phase of the disease because the majority of people infected experience no

12  symptoms during this phase of the disease.  Those who do experience the acute phase symptoms

13  are rarely ill enough to seek medical attention.  Current treatment is a combination of Pegasys

14  and Ribavirin, an antiviral drug, for a period of twenty-four or forty-eight weeks, depending on

15  the genotype.  Indications for treatment include patients with proven hepatitis C virus infection

16  and persistent abnormal liver function tests.  Sustained cure rates occur in seventy-five percent of

17  people with genotypes HCV 2 and 3 after twenty-four weeks of treatment.  They occur in fifty

18  percent of people with genotype 1 after forty-eight weeks of treatment, and in sixty-five percent

19  of people with genotype 4 after forty-eight weeks of treatment.  Current guidelines strongly

20  recommend that hepatitis C patients receive hepatitis A and B vaccinations if they have not been

21  exposed to the viruses because exposure would radically worsen their liver disease.

22          On February 6, 2003, Dr. Hooper ordered a blood test for plaintiff and discovered

23  a hepatitis C viral load of 77,434.  Plaintiff was referred to Dr. Sogge, a gastrointestinal

24  specialist, who saw him for the first time on July 9, 2003.  Dr. Sogge noted plaintiff's viral load

25  in excess of 70,000 and ordered a liver biopsy.  Plaintiff underwent a liver biopsy on September

26  /////

8, 2003, but no liver tissue was obtained.  Dr. Sogge saw plaintiff again on October 15, 2003, and ordered him to return for a follow-up visit within one to two months.

On December 10, 2003, Dr. Hooper ordered hepatitis A and B vaccinations for plaintiff.  Plaintiff consented to the vaccinations and received the first shots of the hepatitis A and B vaccination on December 17, 2003.[1]  Plaintiff received the second shot of the hepatitis B vaccination on January 23, 2004, and the final shot of the hepatitis A and B vaccination on June 29, 2004.

On May 12, 2004, Dr. Sogge saw plaintiff.  Plaintiff's viral load had decreased significantly and his chem panels were acceptable, so Dr. Sogge chose to continue plaintiff's combination therapy.  Dr. Sogge saw plaintiff again on November 10, 2004 and ordered a viral load test which showed an increased value of 55,130.

On February 2, 2005, Dr. Sogge saw plaintiff again.  Plaintiff had received the full series of combination therapy, but based on his increased viral load, Dr. Sogge concluded that the combination therapy failed.  The FDA had not approved the combination therapy for more than forty-eight weeks, so Dr. Sogge ordered that plaintiff discontinue it.  As noted above, the cure rate for patients with plaintiff's hepatitis C genotype is about fifty percent with forty-eight weeks of treatment.

On February 1, 2006, Dr. Sogge saw plaintiff again.  Plaintiff's liver function had not changed.  Dr. Sogge ordered another liver biopsy to guide further follow-up.  Plaintiff underwent the biopsy on March 6, 2006.  The biopsy revealed mild disease, grade 2, stage 2. Plaintiff suffered no ill effects or consequences from his failure to respond to the original treatment or from the liver biopsies.

---

[1]  Plaintiff was unable to attend scheduled appointments with Dr. Sogge on December 24, 2003, and January 7, 2004.  On January 21, 2004, Dr. Sogge saw plaintiff and noted that his viral load was at 69,000, with genotype 1b and concluded that plaintiff met the criteria for treating chronic hepatitis C with a combination therapy of Pegasys and Ribavirin.  Dr. Sogge prescribed plaintiff the standard forty-eight week medication regimen.  In addition, Dr. Sogge ordered periodic lab tests and a follow-up visit in three months.

F.  <u>Defendants Grannis and Van Cor's Involvement in Plaintiff's Treatment</u>

Defendants Grannis and Van Cor are not doctors and thus do not prescribe medical treatments or diagnostic procedures.  They do not perform medical examinations of, or otherwise provide medical care for, any inmate.

II.  <u>Defendants' Arguments</u>

Based on this evidence, defendants argue that they are entitled to summary judgment because plaintiff's medical care was reasonable and medically acceptable.  (Defs.' Mot. for Summ. J. at 3.)  Defendants concede that plaintiff suffers from a myriad of serious medical conditions, but they contend the record demonstrates that the care provided to him was the complete antithesis of deliberate indifference to serious medical needs.  (<u>Id.</u> at 4.)

Defendants maintain that plaintiff received reasonable and medically acceptable treatment for his serious medical conditions.  (Defs.' Mot. for Summ. J. at 6-16.)  With respect to plaintiff's hypertension, defendants contend that the undisputed facts demonstrate that clinicians were attentive to his medical needs.  (<u>Id.</u> at 6.)  With respect to plaintiff's chronic degenerative disease of the cervical and lumbar spine, defendants argue that plaintiff's claims amount to a mere difference of opinion concerning the appropriate treatment.  (<u>Id.</u> at 10.)  Regarding plaintiff's carpal tunnel syndrome defendants contend that they did not cause, and could not realistically prevent, any delays in the scheduling of plaintiff's appointments with specialists. (<u>Id.</u> at 12.)  Most importantly, defendants note that there is no medical evidence that any delay in plaintiff's carpal tunnel treatment resulted in harm to him.  (<u>Id.</u>)  With respect to plaintiff's pain management, defendants argue that he continuously received a wide variety of pain medication ranging in strength.  (<u>Id.</u> at 14.)  With respect to plaintiff's hepatitis C, defendants contend that his failure to respond to treatment does not constitute an Eighth Amendment violation.  (<u>Id.</u> at 17.)

Finally, defendants contend that there is no causal link between the acts or omissions of defendants Grannis and Van Cor's and plaintiff's alleged constitutional deprivation.

1   (Defs.' Mot. for Summ. J. at 17-18.)  Defendants argue that Grannis and Van Cor are not medical

2   doctors and could not take steps to avert the harm, if any, caused by the health care delivery

3   system's alleged failure to attend to plaintiff's medical needs.  In addition, to the extent that

4   plaintiff has sued defendants Grannis and Van Cor because of their responses to his inmate

5   appeals, they argue that plaintiff has failed to state a cognizable claim.  (Defs.' Mot. for Summ. J.

6   at 18.)  Defendants contend that the mere denial of plaintiff's inmate appeals does not implicate

7   the Due Process Clause.  Moreover, they contend California has not created a protected interest

8   in an administrative appeal system in its prisons.

9   III.  Plaintiff's Opposition

10          Plaintiff argues that because the defendants have violated his constitutional right

11   to adequate medical care, the court should deny their motion for summary judgment.  (Pl.'s

12   Opp'n to Defs.' Mot. for Summ. J. at 2.)

13          First, plaintiff argues that the treatment he received for his hypertension was not

14   reasonable or medically acceptable.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 3.)  Plaintiff

15   contends that he filed an inmate appeal on February 19, 2003, because he had been diagnosed

16   with high blood pressure several years earlier but was not receiving any treatment for the

17   condition.  (Id.)  Plaintiff contends that Dr. Penner did not prescribe him medication until May

18   22, 2002 and that the medication was not effective.  Plaintiff contends that Dr. Penner never

19   referred him to a specialist but instead prescribed six different medications over a three-year

20   period.  Plaintiff contends that as a result of this inadequate and delayed treatment he suffered

21   from continuous pain, blinding headaches, dizziness, nausea and heart palpitations.  (Id.)

22          Second, plaintiff contends that the treatment he received for his chronic,

23   degenerative cervical and lumbar spine disease was not reasonable or medically acceptable.

24   (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 3.)  Plaintiff asserts that although he received

25   Gabapentin for pain, he needed a stronger pain medication.  (Id. at 4.)  In addition, plaintiff

26   contends that defendants Wedell and Hooper refused to submit the necessary "urgent" referral

1   requests for him to see a specialist.  Plaintiff notes that on October 11, 2002, he reported to

2   medical staff that he was experiencing tingling and numbness in his arms and pain in his legs.

3   Nonetheless, a consultation with a neurologist was not ordered until December 11, 2003, a full

4   year and two months after he reported his symptoms.  (Id.)  Moreover, plaintiff contends that he

5   did not see Dr. Farr, an orthopedic specialist, until six months later still on May 17, 2004.

6   According to plaintiff, Dr. Farr reported that plaintiff should have seen him long before his

7   appointment date and informed plaintiff that his condition had reached a point where surgery was

8   no longer advisable.  Dr. Farr recommended an epidural steroid injection instead.  Plaintiff

9   contends that a timely surgery would have reduced his pain to a minimum and allowed him to

10  function without large amounts of daily pain medication.  In addition, plaintiff contends that

11  surgery would have slowed down the degeneration of his discs.  (Id.)  Plaintiff argues that the

12  delay he experienced in receiving adequate treatment for his cervical and lumbar spine disease

13  was unreasonable and required Dr. Farr to prescribe the less efficacious treatment, depriving him

14  of the opportunity to live pain free for some years before he would have to undergo regular

15  epidural steroid injections.  (Id. at 4-5.)

16          Third, plaintiff argues that the treatment and care he received for his carpal tunnel

17  syndrome was not reasonable or medically acceptable.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J.

18  at 5.)  Plaintiff contends that, if defendants had submitted an "urgent" referral request, he would

19  have been scheduled to see the specialist within two to three weeks.  Plaintiff asserts that without

20  an "urgent" request, scheduling such referral appointments takes months.  Plaintiff contends that

21  he complained of severe pain, numbness, and tingling in his arms for eight months in 2002, but

22  nearly a year passed before he was referred to and eventually seen by Dr. Hevor, a neurologist.

23  Dr. Hevor told plaintiff that he should see a specialist immediately to rule out bilateral carpal

24  tunnel syndrome.  Plaintiff argues that despite his need for  immediate treatment, Dr. Wedell

25  merely submitted a "routine" referral request for an EMG with Dr. Friend on March 18, 2003.

26  Subsequently, Dr. Hooper merely submitted another "routine" request for an EMG about eight

1  months later on November 7, 2003.  Plaintiff contends that throughout this period of unnecessary

2  delay he continued to complain of severe pain in his hands and tingling and numbness in his

3  arms.  Finally, on July 26, 2004, Dr. Wedell submitted an "urgent" request that plaintiff receive a

4  consultation with a specialist.  Plaintiff notes that he did not actually see Dr. Friend until

5  September 10, 2004, more than two years after he believed he was suffering from carpal tunnel

6  syndrome.  (Id. at 5-6.)

7      Plaintiff maintains that defendants Wedell and Hooper clearly caused this

8  unreasonable delay in proper treatment by refusing to submit urgent requests for consultation

9  with a specialist.  Plaintiff argues that by the time he saw Dr. Friend, he was unable or unwilling

10  to diagnose plaintiff with carpal tunnel syndrome but instead agreed with Drs. Wedell and

11  Hooper that plaintiff was feigning his symptoms in an attempt to obtain drugs.  Plaintiff contends

12  that due to Dr. Friend's incompetence, another two months passed before he saw Dr. Williams,

13  who ultimately recommended the necessary carpal tunnel release surgery.  (Id.)

14      Fourth, plaintiff contends that the care he received for pain management was not

15  reasonable or medically acceptable.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 6.)  Plaintiff

16  argues that Drs. Hooper and Wedell were well aware that he was in a state of continuous and

17  severe pain, but continued to prescribe a wide variety of ineffective medications.  (Id. at 6-7.)

18      Fifth, plaintiff argues that the treatment he received for his hepatitis C was not

19  reasonable or medically acceptable.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 7.)  Plaintiff

20  contends that Dr. Sogge knew as early as February 2003 that plaintiff had tested positive for

21  hepatitis C.  Plaintiff contends that a liver biopsy was to be performed on September 8, 2003, but

22  inexplicably no liver tissue was obtained as a result of the procedure and no further procedure

23  was undertaken to obtain the tissue for analysis.  (Id. at 7-8.)  Plaintiff contends that Dr. Sogge's

24  failure to re-schedule a biopsy resulted in his treatment being delayed by a full year.  (Id. at 8.)

25  Plaintiff points to an expert report from Dr. Natalie Bzowej, M.D. Ph.D., submitted in the case of

26  /////

1   Marks E. Tatum v. D.W. Winslow, No. C 00-3465 VEW (N.D. Cal. 2000).[2] (Id., Ex. G.)

2   Plaintiff cites to Dr. Bzowej's opinion, expressed in that report, that early evaluation, including

3   liver biopsy, is imperative for those diagnosed with hepatitis C, and that early evaluation makes it

4   more likely that the virus can be cleared from the patient's blood and avoid liver damage.

5   Plaintiff concludes that Dr. Sogge's failure to treat him in a timely fashion resulted in a full year

6   of liver damage and may well have resulted in plaintiff's treatment being ineffective. (Id.)

7           Finally, plaintiff argues that defendants Grannis and Van Cor placed themselves

8   in the position of making the final judgment as to all of the medical issues in his case. (Pl.'s

9   Opp'n to Defs.' Mot. for Summ. J. at 8-9.) In so doing, plaintiff contends that they are

10   responsible for the care that he did or did not receive. (Id.)

11   IV.  Defendants' Reply

12           In reply, defendants contend that plaintiff has presented no evidence showing that

13   they were deliberately indifferent to his serious medical needs but instead presents only argument

14   as to he facts as he perceives them. (Defs.' Reply at 2.) Defendants contend that because this

15   case involves complex medical issues with plaintiff contesting the type of treatment he received,

16   expert opinion is necessary to establish deliberate indifference. (Id.) Defendants note that

17   plaintiff's reference to Dr. Bzowej's report, regarding the treatment of Markus E. Tatum, is

18   unauthenticated, inadmissible and is not an expert opinion that any of the treatment received by

19   plaintiff reflects deliberate indifference by prison officials in this case.

20           Defendants reiterate that the undisputed facts show that Drs. Wedell and Hooper's

21   care and treatment of plaintiff's serious medical conditions was reasonable and medically

22   acceptable; that Dr. Friend was involved only with the diagnosis of plaintiff's carpal tunnel

23   syndrome and was not involved in scheduling delays that may have occurred; that plaintiff

24   _____

25       [2]  In that expert report dated September 16, 2003, Dr. Bzowej states that she was then the
     Director of Clinical Hepatology Research, Department of Transplantation at the California
26       Pacific Medical Center in San Francisco and that she was retained by the plaintiff in that case as
     an expert witness.

1   alleges nothing more than a difference of opinion as to the course and scope of treatment

2   provided by Dr. Howard; and that plaintiff merely failed to respond to Dr. Sogge's extensive

3   treatment of his hepatitis C in a situation where the medical probability of success is only fifty

4   percent.  Defendants contend that this evidence establishes that they were not deliberately

5   indifferent to plaintiff's serious medical needs.

6          Finally, defendants contend that plaintiff has failed to allege a cognizable federal

7   constitutional claim against defendants Grannis and Van Cor because the denial of an inmate

8   appeal does not implicate the Due Process Clause.

9                                              **ANALYSIS**

10         As an initial matter, the parties do not dispute that plaintiff's medical conditions

11  are serious.  McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable

12  doctor or patient would find important and worthy of comment or treatment; the presence of a

13  medical condition that significantly affects an individual's daily activities; or the existence of

14  chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for

15  medical treatment.").  Accordingly, resolution of the pending motion for summary judgment

16  hinges on whether defendants responded to plaintiff's serious medical needs with deliberate

17  indifference.  Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

18         The undersigned finds the delays in treating plaintiff's carpal tunnel and hepatitis

19  C conditions to be very troubling.  Nonetheless, the court finds that defendants have borne their

20  initial responsibility of demonstrating that there is no genuine issue of material fact with respect

21  to the adequacy of the medical care they provided to plaintiff for his hypertension, degenerative

22  spine disease, pain management, carpal tunnel syndrome, and hepatitis C.  First, defendants'

23  evidence demonstrates that the defendant doctors prescribed appropriate medication for

24  plaintiff's medical conditions, adjusting medication dosages when appropriate and switching

25  /////

26  /////

1    medications when necessary.[3]  Second, defendants' evidence demonstrates that the defendant

2    doctors ordered numerous diagnostic tests to determine the cause underlying plaintiff's medical

3    complaints.  For example, the defendants doctors ordered blood tests, x-ray examinations, MRI

4    examinations, EMG examinations, nerve conduction studies, liver biopsies and a whole body

5    bone scan.  Third, defendants' evidence reflects that they referred plaintiff to appropriate

6    specialists for consultation and treatment regarding his various medical conditions.  For example,

7    plaintiff saw outside specialists with regards to his degenerative spine disease, carpal tunnel

8    syndrome and hepatitis C.  Finally, defendants' evidence demonstrates that they have provided

9    plaintiff with medical treatment for all of his medical conditions.  In addition to the array of

10   medication plaintiff has received along with regular evaluations by primary care physicians and

11   chronic care physicians, defendants have ordered and authorized for plaintiff frequent blood

12   pressure checks and monitoring of his hypertension, physical therapy, apparently, epidural

13   steroidal injections for his degenerative spine disease[4], bilateral carpal tunnel splints and wrist

14   braces as well as surgery for his carpal tunnel syndrome, and the standard forty-eight week

15   medication regimen involving Pegasys and Ribavirin for his hepatitis C.  Defendants' evidence

16   demonstrates that plaintiff was seen and treated numerous times by an array of doctors.  Initially,

17   defendants considered conservative treatment options, and as plaintiff continued to complain

18   about ongoing problems or other medical conditions, defendants modified his medication and

19   scheduled or referred him for additional medical appointments at the prison or with outside

20   specialists.  Based on defendants' evidence, the court finds that they provided plaintiff with

21

22        [3]  For example, over the course of plaintiff's hypertension treatment, defendants
     prescribed him Amlodipine, Norvasc, Enalapril, Clonidine, Hydrochlorothiazide, and Lisinopril
23   until ultimately plaintiff's blood pressure returned to pre-hypertensive levels.  Similarly, over the
     course of plaintiff's pain management treatment, defendants continuously prescribed him pain
24   relievers ranging in strength, including Tylenol 3, Gabapentin, Naproxen, Triamcinolone,
     Methocarbamol, and Vicodin.
25

26        [4]  It is not clear from the parties' evidence whether Dr. Farr merely recommended or
     actually administered to plaintiff the epidural steroidal injections.

1  reasonable and medically acceptable care.  Thus, the burden shifts to plaintiff to establish the

2  existence of a genuine issue of material fact precluding summary judgment in defendants' favor.

3          The court has considered plaintiff's opposition to the pending motion for

4  summary judgement as well as his complaint.  The undersigned finds that plaintiff has failed to

5  submit any evidence establishing a legitimate dispute as to a genuine issue of material fact.  For

6  example, plaintiff contends that defendants were deliberately indifferent to his medical needs

7  because they prescribed a wide variety of ineffective medications for his hypertension and pain

8  management.  However, all that has been submitted by plaintiff as to the ineffectiveness of his

9  medication is his own contrary opinion regarding the appropriate course of treatment for his

10  conditions.[5]  As noted above, mere differences of opinion between a prisoner and prison medical

11  staff as to proper medical care does not give rise to a § 1983 claim.  Jackson, 90 F.3d at 332;

12  Sanchez, 891 F.2d at 242; Franklin, 662 F.2d at 1344; see also Fleming v. Lefevere, 423 F. Supp.

13  2d 1064, 1070 (C.D. Cal. 2006) ("Plaintiff's own opinion as to the appropriate course of care

14  does not create a triable issue of fact because he has not shown that he has any medical training

15  or expertise upon which to base such an opinion.").

16          Plaintiff also contends that defendants refused to timely refer him to specialists or

17  failed to timely treat his medical conditions.  Although plaintiff's care, particularly his being seen

18  by outside specialists pursuant to referrals, involved inexcusable delays in the undersigned's

19  opinion, plaintiff has produced no evidence demonstrating that the defendants named in this

20  action caused or could have prevented the delays.  See McGuckin, 974 F.2d at 1062 (affirming

21  grant of summary judgment in favor of two physicians because the record failed to demonstrate

22  that either was responsible for scheduling diagnostic examinations or hindered the performance

23  of such examinations in that case).  Rather, the record appears to reflect that when the defendant

24

25          [5] Moreover, plaintiff primarily complains about Dr. Penner's treatment of his
   hypertension, arguing that he prescribed him six different medications over a three-year period
26  when he should have referred him to a specialist.  However, Dr. Penner is not a defendant in this
   action.

1    doctors finally were made aware that their referrals of plaintiff for treatment by specialists had

2    been delayed, they re-submitted their requests and marked them "ASAP" or "urgent."  Most

3    importantly for resolution of the pending motion for summary judgment, plaintiff has tendered no

4    evidence suggesting that any delays in his medical treatment ultimately caused him harm.[6]  See

5    Berry, 39 F.3d at 1057; McGuckin, 974 F.2d at 1059; Wood, 900 F.2d at 1335; Hunt, 865 F.2d at

6    200; Shapley, 766 F.2d at 407.  Instead, plaintiff merely argues that he experienced constant pain

7    during the lengthy delays in treatment.  However, as noted above, defendants adequately

8    addressed plaintiff's complaints regarding pain by continuously providing him with a wide

9    variety of prescription pain relievers.[7]

10           Finally, plaintiff has provided no competent evidence demonstrating that the

11    course of treatment defendants chose for any of his medical conditions was medically

12    unacceptable under the circumstances.  Jackson, 90 F.3d at 332 ("to prevail . . . Jackson must

13

14       [6] Plaintiff has only offered the court his own speculation as to harm possibly resulting from the delays in scheduling consultation appointment with outside physicians following

15    referrals by prison doctors.  For example, plaintiff contends that Dr. Sogge's failure to treat him in a timely fashion resulted in liver damage continuing for a full year and may have adversely

16    affected the results obtained from the combination therapy he eventually received.  However, plaintiff provides no evidence to support his contention.  In fact, according to evidence submitted

17    by defendants, the cure rate for patients with plaintiff's hepatitis C genotype is only about fifty percent with forty-eight weeks of treatment.  In this regard, the evidence before the court

18    indicates that plaintiff is similarly situated with one out of two patients who fail to respond to the combination treatment.

19       [7] Nonetheless, as noted above, the undersigned is very concerned regarding the delay plaintiff experienced in seeing and receiving treatment from outside specialists after referrals

20    were made by prison doctors.  This is a reoccurring issue in cases before this court with the usual refrain from defendants being that they are not responsible for the scheduling of appointments for

21    prisoners with specialists.  At least in the undersigned's recent experience, counsel for defendants do not offer a complete explanation as to the procedure that is to be employed when a referral is

22    made and where the responsibility lies when delays, such as those in this case, result.  Needless to say, were there evidence here of actual harm suffered as a result of delays in obtaining outside

23    treatment, the recommendation set forth above would be different and defendants would be required to come forward, either in support of a motion or at trial, with a detailed explanation of

24    the governing procedures and the responsibilities of various prison officials in such circumstances.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982) (prison medical staff

25    must be able to treat medical problems or refer prisoners to others who can and such referrals may be to physicians outside the prison "if there is reasonably speedy access to these other

26    physicians or facilities.")

1   show that the course of treatment the doctors chose was medically unacceptable under the

2   circumstances.").  Nor has plaintiff shown that defendants chose the course of treatment in

3   conscious disregard of an excessive risk to his health.  Id.  In fact, the volume and content of

4   plaintiff's medical records as well as the frequency of his medical visits contradicts his subjective

5   belief that defendants ignored or failed to respond reasonably to his medical needs.  Plaintiff's

6   medical care was certainly inefficient at times due to the failure to schedule consultations with

7   outside specialists following the issuance of referrals by prison doctors.  Nonetheless, plaintiff

8   has failed to demonstrate that the defendants named in this action were deliberately indifferent to

9   his medical needs.[8]

10          Accordingly, for the reasons set forth above defendants' motion for summary

11  judgment should be granted.[9]

12                                           **CONCLUSION**

13          In accordance with the above, IT IS HEREBY RECOMMENDED that:

14          1.  Defendants' April 27, 2007 motion for summary judgment be granted; and

15          2.  This action be dismissed.

16  /////

17  /////

18

19          [8]  In light of the conclusion reached above that the defendant doctors are entitled to
    summary judgment in their favor, the defendants who merely responded to plaintiff's

20  administrative appeals regarding his medical care (Grannis, Howard, and Van Cor), likewise
    cannot be found to have been deliberately indifferent to plaintiff's serious medical needs.  It is

21  undisputed that defendants Grannis, Howard, and Van Cor did not treat plaintiff.  In addition, to
    the extent that plaintiff has named them as defendants because of their involvement in the inmate

22  appeals process, plaintiff fails to state a claim.  Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir.
    2003) ("inmates lack a separate constitutional entitlement to a specific grievance procedure")

23  (citing Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988)).

24          [9]  Although plaintiff claimed in his original complaint that his rights under Fifth, Eighth,
    and Fourteenth Amendments had been violated, he failed to allege any such cognizable

25  constitutional claims.  Inadequate medical care constitutes an Eighth Amendment violation.
    Estelle, 429 U.S. at 104.  Accordingly, this case properly proceeded on Eighth Amendment

26  grounds, and any Fifth or Fourteenth Amendment claims should be dismissed for failure to state
    a claim.

1        These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3  days after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  A document containing objections

5  should be titled "Objections to Magistrate Judge's Findings and Recommendations."  Any reply

6  to objections shall be served and filed within ten days after service of the objections.  The parties

7  are advised that failure to file objections within the specified time may, under certain

8  circumstances, waive the right to appeal the District Court's order.  See Martinez v. Ylst, 951

9  F.2d 1153 (9th Cir. 1991).

10  DATED: January 10, 2008.

11

12

13                                   DALE A. DROZD

                                     UNITED STATES MAGISTRATE JUDGE

14  DAD:9

    tril0075.57

15

16

17

18

19

20

21

22

23

24

25

26